STATE AUTOMOBILE MUTUAL
INSURANCE CO., Plaintiff,

v.

AMERICAN RE–INSURANCE
CO., Defendant.

No. C2–87–223.

United States District Court,
S.D. Ohio, E.D.

Aug. 23, 1990.

Harold Reader, Cleveland, Ohio, for plaintiff.

David Day, Columbus, Ohio, for defendant.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This matter is before the Court upon the defendant's motion for summary judgment and the plaintiff's cross motion for summary judgment. Defendant has filed a memorandum contra to the plaintiff's cross motion and a reply memorandum in support of its motion for summary judgment. Plaintiff has filed a memorandum contra to the defendant's summary judgment motion coupled with a reply memorandum in support of its motion for summary judgment. This suit is before this Court pursuant to a complaint filed by the plaintiff, State Automobile Mutual Insurance Co., ("State Auto") alleging a breach of an insurance contract by the defendant, American Re–Insurance Co. ("American"). The plaintiff states that jurisdiction is proper under 28 U.S.C. § 1332, Diversity of Citizenship. The Court, herein, will rule upon the two pending summary judgment motions.

## FACTS

This case is a dispute between State Auto, an insurance company, and Ameri-

can, a reinsurance company.[1] As stipulated by the parties, in September, 1985, State Auto issued a Preferred Business Policy identified as Policy Number PBP7 817 152 ("The Policy") to Industrial Fabricators Company, Inc., ("IFC"). The Policy was to be effective from September 1, 1985, to September 1, 1986, and afforded coverages to IFC and certain other entities, subject to its terms and conditions, for property located at 20 Phillips Road in Jackson, Tennessee ("The Property"). (See Stipulation of August 9, 1988, Paragraph 1).

The Policy set forth separate limits of coverage for the building, contents and a building under construction (otherwise known as "Builders' Risk" coverage) at the property as follows:

| Designated Premises | Coverage | Forms | Limits |
|---|---|---|---|
| 20 Phillips Road | Bldg. | MP0013 | $1,100,000 |
| Jackson, Tennessee | Conts. | MP0014 | $1,350,000 |
| (Location No. 1) | Bldg. | MP1103 | $1,500,000 |
| | Loss of Income | | $2,000,000 |
| | EDP (Electronic Data Processing) | | $ 268,726 |
| | | | $6,218,726 |

(See Stipulation of August 9, 1988, Paragraph 2).

---

In August of 1985, prior to the issuance of The Policy, R. Thomas Morgan ("Morgan"), State Auto's Commercial Property Underwriting Manager, began contacting reinsurance companies in an attempt to obtain reinsurance for the proposed coverages. Morgan contacted Roy Truemper ("Truemper") a senior underwriter for American. During their discussions Morgan explained the extent of the IFC proposed insurance policy. At no time did they discuss the Builders' Risk policy on the building that was to be constructed. Truemper agreed on behalf of American to reinsure 40 percent of the proposed coverage.

In early October, 1985, after the policy had been issued, Morgan received a telephone call from George Furlong ("Furlong"), a supervisor in the Commercial Underwriting Department at State Auto's Madison, Tennessee office. Furlong informed Morgan that IFC was having a new building constructed next to the existing structure that had already been insured in the policy. Furlong erroneously informed Morgan that the original building and the new structure were to be separate buildings joined only by a common walkway, with fire doors at each end. In fact, the new structure was built adjacent to the existing structure, separated only by a common fire wall.[2]

Morgan contracted Truemper on October 7, 1985, to obtain reinsurance on the new construction. American, through Truemper, agreed to reinsure 40 percent of the new construction, to go along with the prior 40 percent reinsurance commitment they

1. Typically, the relationship between an insurance company and a reinsurance company is a contractual one. The insurance company initially issues a policy to the insured. To limit the insurance company's potential exposure the insurance company sells off percentages of its liability to reinsurance companies. These reinsurance companies essentially agree to indemnify the insurance company up to a certain percentage in the event the original insured sustains an insured loss.

2. In the defendants' motion for summary judgment they argue that State Auto's failure to accurately disclose the relationship between the two structures constitutes the misrepresentation of a material fact affecting the risk, which thereby renders the reinsurance agreement voidable. Without lengthy discourse, the Court is inclined to disagree with this argument inasmuch as it was only the new structure that burnt, therefore the structural relationship the two buildings shared is not relevant. And, there is no evidence to show that a proper disclosure would have dissuaded American from reinsuring the building.

had made on the existing building, the existing building's contents, any loss of income with respect to the existing building, and the electronic data processing materials contained in the existing building.

On October 31, 1985, American issued to State Auto a Certificate of Facultative Property Reinsurance, Certificate No. 7426764 ("Certificate of Reinsurance"). The second page of the Certificate of Reinsurance consists of a list of "General Conditions", that lay out the terms of agreement with relationship to the reinsurance policy.[3]

On January 3, 1986, with the new construction nearly completed, Joseph Hall ("Hall"), the insurance agent through whom State Auto insured IFC, wrote to Furlong requesting that certain changes be made in the policy. Specifically, Hall asked that the separate coverages on the building, the contents, the Builders' Risk, the lost income and the electronic data processing, be deleted and replaced by a single blanket policy ("The Blanket Policy") of $5.3 million on both structures and their contents. The letter arrived at Furlong's office on January 6. Furlong was on vacation, therefore, it was only upon his return on January 14 that he gained knowledge of the letter. On the fourteenth of January, Furlong contacted Morgan's office to ask if the home office would approve the requested change, however, Morgan was unavailable. Therefore, as of January 14, State Auto had neither approved nor rejected the requested changes. Likewise, American had not been advised of the proposed changes, therefore, they too had not approved or rejected the changes.

On January 14, 1986, the same day Furlong had tried to contact Morgan, a fire occurred at the property of IFC. (See Stipulations of August 9, 1988). The *new*

structure and its contents were totally destroyed.

Due to actions on the part of State Auto and its agent, Hall Insurance Agency, Inc., before the fire, State Auto, with advice from counsel, concluded that the limits of coverage under the policy issued to IFC for the property were changed to a blanket limit coverage, and State Auto was bound to a single, all inclusive limit of Five Million, Two Hundred Fifty Thousand Dollars ($5,250,000) for the buildings and contents, and an additional Two Million for loss of income. No approval of such change in coverage was obtained from American. (See Stipulation of August 9, 1988).

IFC submitted a proof of loss to State Auto which listed losses of One Million, One Hundred Fifty Two Thousand, Twenty Nine Dollars ($1,152,029) in damage to the new building itself, damages of One Million, Twenty Thousand, Six Hundred and Forty Two Dollars ($1,020,642) to inventory, damages of Eight Million, Five Hundred Sixty Two Thousand, Five Hundred Forty Nine Dollars ($8,562,549) to machinery and equipment, and damages of Three Million, Seven Hundred Ninety Thousand, Eight Hundred Ninety Dollars ($3,790,890) in lost income. The total proof of loss was Fourteen Million, Five Hundred Twenty Six Thousand, One Hundred Ten Dollars ($14,526,110). IFC submitted a demand to State Auto in the amount of $5.5 million. However, IFC and State Auto settled the claim for $4.8 million.

State Auto paid IFC the $4.8 million, then sought the 40 percent indemnification sum from American. In response American agreed to pay the contract percentage, 40 percent of the damages to the *new* structure, or Four Hundred Fifty Eight Thousand, Eight Hundred Sixty Four Dollars ($458,864). State Auto claims an addi-

---

3. Specifically, the relevant section provides as follows:

    1. The Reinsurer agrees to indemnify the Company against losses or damages which the Company is legally obligated to pay under the policy reinsured, resulting from occurrences taking place during the period this Certificate is in effect *subject to the reinsurance limits shown on the face of this Certificate. The*

*Reinsurer shall not indemnify the Company for liability beyond circumscribed policy provisions,* including but not limited to punitive, exemplary, consequential or compensatory damages resulting from an action of the policyholder or assignee against the Company, the Company agrees to notify the Reinsurer promptly of any changes made in the policy reinsured ... (emphasis added).

tional One Million, One Hundred Seventy Three Thousand, One Hundred Thirty Six Dollars ($1,163,136) is due and owing.

## STANDARD OF REVIEW

In considering this motion, the Court is mindful that the standard for summary judgment "mirrors the standard for a directed verdict under [Rule 50(a)], which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) citing *Brady v. Southern Ry. Co.*, 320 U.S. 476, 479–480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943). Thus, the Supreme Court concluded in *Anderson* that a judge considering a motion for summary judgment must "ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented." 477 U.S. at 252, 106 S.Ct. at 2512.

Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In essence, the inquiry is whether the evidence presented a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. 477 U.S. at 252, 106 S.Ct. at 2512.

Such an inquiry necessarily implicates the evidentiary standard of proof that would apply at the trial on the merits. As a result, the Court must view the evidence presented through the prism of the substantive evidentiary burden. Rule 56(e) therefore requires that the nonmoving party go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (emphasis added). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322, 106 S.Ct. at 2552.

In *Banks v. Rockwell International N. Am. Aircraft Operations*, 666 F.Supp. 1053 (S.D. Ohio 1987), this district Court, Graham J., enunciated the importance of granting summary judgments in appropriate situations:

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed to secure the just, speedy and inexpensive determination of every action." Citing: *Celotex Corp. v. Catrett*, 477 U.S. 317, at 324, 106 S.Ct. 2548, at 2553, (quoting Fed.R.Civ.P. 1) *Anderson*, 477 U.S. 242, at 252, 106 S.Ct. 2505, at 2512.

Thus, the mere existence of a scintilla of evidence in support of a plaintiff's claim is insufficient—there must be evidence upon which a jury could reasonably find for the plaintiff. Having discussed the Rule 56 standard of review, the Court now turns to the merits.

## ANALYSIS

In this matter it is clear that there are no questions of fact for a jury to decide. Essentially, both parties have stipulated to all material facts and those that were not stipulated appear to be uncontested. Therefore, the case boils down to the issue of whether American should be required to reimburse State Auto for 40 percent of the total loss paid out to IFC. American argues that they are only required to indemnify State Auto to the extent of the Builders' Risk policy on the new structure, since that is all that burned down and all that American by the terms of the original agreement had insured.

State Auto argues that American is bound to the blanket policy which State Auto was required to pay upon, since the "loss suffered is still clearly within the scope of the risk which Am Re [American] agreed to assume". *See* Plaintiff's Motion for Summary Judgment at p. 3. Essentially, State Auto's contention is that under the original insurance agreement American had a total potential liability of One Million, Seven Hundred Eighty Thousand Dollars. This is the amount that American would have agreed to pay to State Auto *if* the original structure, the original structure's contents and the electronic data processing equipment had been destroyed, coupled with the loss of income and the destruction of the new building that was under construction. However, the actual destruction was limited only to the new structure covered by the Builders' Risk policy. Furthermore, it is clear that the Builders' Risk policy did not cover loss of income, electronic data processing equipment, and contents, inasmuch as the purpose of the Builders' Risk policy was to cover the structure while under construction and to cover the contents of the structure, e.g. builders equipment, building supplies, etc.

Nonetheless, State Auto's argument continues providing that "[American] was willing in return for the premium payments which it received from State Auto, to accept the following *risk:* 'A certain *probability* (the likelihood that the original structure and its contents would be destroyed) that it would have to reimburse State Auto in the *amount* of One Million, Seven Hundred Eighty Thousand Dollars or more.' " (emphasis in original). *See,* Plaintiff's Motion for Summary Judgment at p. 3. State

Auto then concludes by stating that: "[i]t simply does not matter that it is the new structure, rather than the original structure, which burned down given that the new structure was not more of a risk than the original structure." *Id.* at 15.

This entire line of argument is devoid of logic and ignores the explicit terms of the underlying reinsurance agreement.[4] It is clear that the insurance agreement between IFC and State Auto was broken down into separate coverages. Likewise, American was approached on two separate occasions to act as a reinsurer, first on the original structure, its contents, loss of income and the EDP system, and then subsequently on a Builders' Risk policy. Therefore, to now attempt to ignore the different policies and argue that they are interchangeable under a "scope" theory is not well taken. Each structure, and each policy issued represents a very particularized risk, independent and succinct of any other.

A second issue addressed by each party is whether American is required to "follow the fortunes"[5] of State Auto beyond the coverages articulated in the reinsurance agreement. To "follow the fortunes" would mean that since State Auto's agent made representations that apparently bound the company to a $5.3 million blanket policy in place of the previous separate policies, American should be required also to be bound by the representations. The practical effect is that American would likewise be bound to indemnify on the blanket policy rather than the separate policies it believed it had reinsured. American, in response, contends that the "courts have consistently held that 'follow the fortunes'

---

**4.** The policy provided separate premiums and separate coverage amounts for each item, to include the original building, the original building's contents, loss of income and the computer. Subsequently, a builders' risk policy was added. *See,* exhibit E of Defendant's Motion for summary Judgment. The fact that these are separate policies with separate coverages is further demonstrated by the internal memorandum from Gene Roberts to Vice President of State Auto, Keith Hobart, wherein the "Reinsurance" section clearly breaks down the proposed reinsurer liabilities. See Exhibit P of Defendant's Motion for Summary Judgment.

**5.** The term "follow the fortunes" is in reference to a clause often found in a reinsurance agreement. Such a clause may require the reinsurer to contribute to a settlement even though it might encompass excluded items. Typically the clause will read, "all claims involving this reinsurance, when settled by the company, shall be binding on the reinsurer." It is not controverted that such a clause did not exist in the instant matter. To the contrary the policy's general conditions provided that, "[t]he reinsurer shall not indemnify the company for liability beyond circumscribed policy provisions".

clauses do not require reinsurers to pay losses excluded by either the terms of the policy reinsured or by the reinsurance contract." To this end the defendant cites to *American Insurance Co. v. North American Co. For Property and Casualty Ins.*, 697 F.2d 79 (2nd Cir.1982); *Insurance Company of North America v. United States Fire Insurance Co.*, 67 Misc.2d 7, 322 N.Y.S.2d 520 (S.Ct.1971), *aff'd* 42 A.D.2d 1056, 348 N.Y.S.2d 122 (1st Dept. 1973); and others.

Without addressing the propriety of the settlement amount based upon State Auto's conclusion that this liability had been extended by the representations of the agent, the Court is confident in stating that said payment was not *ex gratia*. However, the Court still must determine if American should be essentially bound by these representations. The case of *Ambassador Ins. Co. v. Fortress Re, Inc.*, U.S. Dist. Ct., Middle Dist., North Carolina, C–79–101–G, was addressed by each party in their pleadings, and a copy of the decision was attached to the defendant's motion for summary judgment. In that case, as in this case, the reinsurance company was asked to indemnify the primary insurer for those amounts not specifically covered by the reinsurance agreement. In that case the Court stated that "[i]n order to recover, the reinsured must prove a loss falling within the provisions of the policy." *Id.* at p. 19. In so stating, the Court held that the reinsurer had not agreed to reinsure beyond the policy.[6]

This Court finds that a reinsurer cannot be held liable beyond the terms of its contract merely because the primary insurer has agreed to expand the underlying primary agreement. Even in those instances where a "follow the fortunes" clause was found in an agreement the courts have consistently found that the reinsurer is only liable for the loss of the kind reinsured. *See, e.g., Fireman's Fund Insurance Co. v. Aachen and Munich Fire Insurance Co.*, 2 Cal.App. 690, 84 P. 253 (1906). The Court will not compel the reinsurance company to pay for losses which are clearly outside the contemplation of the reinsurance agreement, simply because plaintiff's agents had made what would amount to premature representations to IFC. In relationship to that which was actually destroyed in the fire, American agreed only to facultatively reinsure a separate and distinct policy, with a distinct limit, for the builders risk. However, the Court feels it is worth noting that there is certainly a strong question as to whether American was still bound by the Builders' Risk policy inasmuch as it would appear that IFC had moved inventory, extensive equipment and other items into the building making it virtually operational. It was those factors that greatly increased the actual claim IFC set against State Auto. Therefore, not only had American not been notified as to the completion of the new structure, they had further not been notified and given an opportunity to respond to any changes made in the policy. State Auto cannot now be permitted to have American indemnify them for those policy changes not approved by American. To find otherwise would be to bind American to a dramatic and material alteration to which American was not given so much as the opportunity to accept or deny. Therefore, this Court concludes that American is not required to "follow the fortunes" of State Auto.

■ American additionally moves for summary judgment based upon the argument that State Auto's failure to disclose to American a material fact about the risk involved with the issuance of the builders' risk policy, to wit: That the new structure would share a common wall with the exist-

---

6. Plaintiff State Auto attempts to distinguish *Ambassador* using the same faulty logic previously addressed. State Auto argues that the risks in Ambassador, between that which was actually reinsured and that for which the insurance company wanted to receive indemnification were not the same, thus the loss was not within the "scope" of the reinsurance. However, the Court is disinclined to agree that the instant matter's risks were the same simply because of similar administrative classifications. Nonetheless, the levels of risk did not appear to effect the Ambassador decision one way or the other, and at no time did the court make mention of such an issue in its opinion.

ing structure rather than being separated by a walkway with fire doors at each end, renders the reinsurance agreement voidable. Without extensive and protracted verbiage, the Court will simply state that given the Court's position on the previous arguments it becomes clear that the relationship between the two structures is not at issue, only the agreement as it relates to builders' risk is relevant. Therefore, this argument set forth by the defendant is impersuasive and thereby that argument fails to carry the motion.

Nonetheless, in concluding, this Court is of the opinion that no genuine issues of material fact exist. Furthermore, the Court finds that the plaintiff has failed to set forth any theory upon which this court could conclude that American should be bound by State Auto's agent's representations and subsequent blanket policy. For reasons stated herein the Defendant's Motion for Summary Judgment is hereby GRANTED.

IT IS SO ORDERED.